UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ANGELA COLE,                        )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        No.:   3:06-CV-381
                                    )               (VARLAN/SHIRLEY)
TENNESSEE WATERCRAFT, INC.,         )
                                    )
            Defendant.              )

## MEMORANDUM & ORDER

Plaintiff Angela Cole ("Plaintiff") filed the present civil action against Tennessee Watercraft, Inc. ("Defendant") alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Tennessee Human Rights Act ("THRA"). Plaintiff also makes a claim for common law retaliatory discharge. Defendant has filed a motion for summary judgment [Doc. 22], which is ripe for determination. Defendant has also filed "Motion to Strike the April 30, 2008 Affidavit of Angela D. Cole and Portions of Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant Tennessee Watercraft, Inc.'s Motion for Summary Judgment" [Doc. 47], which Plaintiff has responded to in opposition. [Doc. 50.] Defendant has also filed a "Motion for Leave to Present Oral Argument in Support of Motion for Summary Judgment." [Doc. 48.]

The Court has carefully considered the parties' briefs and supporting materials [Docs. 23, 38, 39, 45, 46, 50, 52] in light of the entire record and controlling law and finds that oral argument regarding the summary judgment motion is unnecessary. Accordingly,

Defendant's Motion for Leave to Present Oral Argument in Support of Motion for Summary Judgment [Doc. 48] is hereby **DENIED**. For the reasons set forth herein, the Defendant's motion to strike [Doc. 47] will be granted in part and denied in part. Defendant's motion for summary judgment [Doc. 22] will be denied.

## I. RELEVANT FACTS

On September 28, 2005, Plaintiff was terminated from her position as a warehouse supervisor by Defendant. [Doc. 35-2 at ¶ 2.] Prior to May of 2003, Plaintiff engaged in a consensual sexual relationship with plant manager, Jeff Dryja ("Dryja"). [Doc. 1 at ¶ 7.] In May of 2003, Plaintiff allegedly ended her consensual sexual relationship with Dryja. [Doc. 1 at ¶ 7.]

After Plaintiff ended her relationship with Dryja in May of 2003 through September of 2005, she alleges that he sexually harassed her "in an attempt to revive and restore the relationship." [Doc. 1 at ¶ 8.] Plaintiff alleges that Dryja harassed her by calling her "a lot" and asking her to come to his office. [Doc. 46-2 at 5, 17-18.] According to Plaintiff, Dryja "would just ask me to see him, and sometimes he would try to hug on me and kiss on me . . . several different times." [*Id.* at 19.] Though some of their conversations were business-related, Plaintiff alleges that the meetings would end with Dryja "[a]lways asking me to meet him or asking me to see him or shutting the door and locking the door behind him as I go in the door and pulling his pants down and doing stuff like that." [*Id.* at 20.] Plaintiff claims that she asked Dryja to stop. [*Id.* at 21.] After one incident of Dryja allegedly calling Plaintiff to

his office, grabbing her, hugging her, and kissing her, Dryja allegedly sent Plaintiff a letter that stated:

> I know this may sound selfish, but what took place last Friday afternoon was something I really needed to happen. I needed to hold you. I needed to kiss you. It was the fix that I had been longing for. It satisfied the effects of withdrawals I was experiencing. I enjoyed it very much. It was a bittersweet experience.

[*Id.* at 4.] After this incident, Plaintiff claims that "[h]e asked me not to tell anybody, I guess." [*Id.* at 7.] Plaintiff did not report this incident or others to Human Resources at the time of occurrence or during the years of 2003 or 2004. [*Id.* at 21.] Plaintiff claims that she was scared to go to Human Resources because "he was the plant manager" and was "their boss." [*Id.* at 7, 10.]

In February of 2005, Plaintiff was interviewed after a coworker, Mary Denomie, filed a charge of discrimination regarding a promotion of Plaintiff by Defendant. [Doc. 22-4 at 7.] In that interview, Plaintiff denied that she had been or currently was in a relationship with Dryja. [*Id.* at 8.] According to Plaintiff, she denied the relationship because she was "scared" of losing her job. [*Id.* at 89.]

On April 1, 2005, Plaintiff attended "Sexual Harassment/Hostile Work Environment" training. [Doc. 22-3 at 31.] Defendant's sexual harassment policy provides:

> Any employee who believes he/she has been the victim of sexual harassment should immediately notify his/her supervisor. If an employee prefers to discuss the circumstances with someone other than his/her supervisor, he/she is invited to contact the Human Resources Manager, the plant Manager, or any other member of management with whom the employee would feel comfortable.

[*Id.* at 29.]

In July of 2005, Dryja allegedly scheduled Plaintiff to go on a business trip to Noonan, Georgia, with him, which included spending the night at a hotel in rooms with adjoining doors. [Doc. 22-3 at 22; 46-2 at 28.] Plaintiff allegedly told Steve Ball ("Ball"), her direct supervisor, that she did not want to spend the night in Georgia with Dryja because she did not want to be alone with him and that Dryja made her feel uncomfortable. [Doc. 46-2 at 28-29.] Ball allegedly responded, "It's not my ball field, Angie, it's Dryja's" and "I don't know what to tell you." [*Id.* at 28.] According to Dryja, he obliged Plaintiff's request to come in the morning with other coworkers. [Doc. 46-7 at 21.] Plaintiff did not report her concerns regarding the Noonan, Georgia, trip to Human Resources. [Doc. 22-3 at 22.]

According to Plaintiff, she first spoke to Human Resources about Dryja's alleged sexual harassment in 2005, though she cannot recall when she first did so. [*Id.* at 19.] In August of 2005, Plaintiff allegedly went to Dryja to express her concerns about Morris Ducote ("Ducote"), one of Dryja's direct managers. [Doc. 46-7 at 5-6.] As a result of a proposed restructuring, Plaintiff's position would be under Ducote's umbrella of responsibility, rather than that of Dryja. [*Id.* at 8.] Allegedly, Ducote made advances toward Plaintiff "a couple years back," and she did not want to work for him. [*Id.* at 10.] The decision was made for Plaintiff's department to be under Ducote's supervision, but Plaintiff was allegedly taken out of Ducote's chain of command due to her concerns regarding Ducote. [*Id.* at 18.] Instead, her direct superior would be Ball, and the chain of command then went to Human Resources rather than Ducote. [*Id.* at 18.] On September 1, 2005, Dryja

allegedly spoke to Plaintiff about the restructuring while both were on the warehouse floor and a heated conversation ensued between Plaintiff and Dryja. [*Id.* at 19.]

In late August and early September of 2005, Plaintiff met with Human Resource representatives. On August 22, 2005, Plaintiff allegedly spoke to Steve Wolfe ("Wolfe"), Manager of Human Resources, concerning Dryja and Ducote. [Docs. 46-3 at 5; 46-8 at 1.] According to Plaintiff, she does not recall discussing Dryja's alleged sexual harassment at that time. [Doc. 46-3 at 8.] On August 25, 2005, Plaintiff allegedly met with Wolfe and Mike Johnson ("Johnson"). [*Id.* at 9-10.] Plaintiff does not recall what she discussed at that meeting. [*Id.* at 10.] After the incident on the warehouse floor between Plaintiff and Dryja, Plaintiff allegedly met with Johnson, Collene Calfee ("Calfee"), and Wolfe about the incident with Dryja, but she does not recall if they spoke about Dryja's alleged sexual harassment. [Docs. 46-3 at 10-12; 46-7 at 3.] At that meeting, Plaintiff discussed how she did not want to work for Ducote and allegedly revealed that she was sexually harassed by Ducote. [Doc. 46-5 at 9.] On September 2, 2005, Plaintiff received a call from Wolfe at home and spoke to him about Dryja, though she does not recall if she spoke to Wolfe about Dryja's alleged sexual harassment. [Doc. 46-3 at 12-13.] On September 5, 2005, Plaintiff met with Calfee to discuss that she would not answer or report to Ducote. [*Id.* at 14.] Plaintiff does not recall if they discussed any other topics at the meeting. [*Id.* at 14.]

According to Plaintiff, she later told Johnson and Calfee about incidents involving Dryja and alleged sexual harassment. [Doc. 46-2 at 23-24.] Plaintiff specifically recalls talking to Calfee about Dryja the night before her termination. [*Id.* at 24.] Allegedly, she told

5

Calfee about Dryja calling her into his office, showing her "his parts," and trying to kiss and hug her, which she told him not to do. [*Id.* at 26.] According to Plaintiff, Calfee did not say anything in response. [*Id.* at 27.] According to Calfee, they did not discuss Dryja's alleged sexual harassment during their conversation. [Doc. 22-8 at 3.]

On September 27, 2005, Plaintiff allegedly called Defendant's facility and paged one of her subordinates, Mike Evans ("Evans"), at 5:35 a.m. [Doc. 22-4 at 21.] According to Plaintiff, she was on her way to work at the time of the call and called to "check[] to see how things were going." [*Id.* at 22.] According to the September 27, 2005, time report, Plaintiff was clocked in at 5:40 a.m. [Docs. 22-4 at 26; 22-5 at 8.] According to Wolfe, security guard, Norma Miller ("Miller"), informed him that Plaintiff had called and paged Evans around 5:40 a.m. [Doc. 22-5 at 1.] Shortly thereafter, another employee, Mary Denomie, allegedly told Miller that she had observed Evans clock in Plaintiff after answering the page. [*Id.* at 2.] Miller also allegedly told Wolfe that she observed Plaintiff drive by the guard shack at 6:11 a.m. [*Id.* at 2.]

On September 28, 2005, Wolfe, Johnson, and Calfee allegedly interviewed Evans who initially denied clocking in Plaintiff but then admitted that Plaintiff had asked him to clock her in because she was running late. [*Id.* at 3.] While on his way to the Human Resources meeting, Evans allegedly stated that Plaintiff had told him to say the page was letting him know that she had gone to the end of the road near the facility and that her meeting at the end of the road was taking longer than expected. [*Id.* at 3.] Johnson and a corporate Human Resources representative, Phil Wendel, allegedly made the decision to terminate Plaintiff.

[Doc. 22-6 at 2.] According to Dryja, the decision was made after investigating the incident and talking to Evans and Miller. [Doc. 46-7 at 25.] According to Defendant, Dryja was allegedly not included in the decision-making process because he was on a business trip in Washington, D.C. [Doc. 22-7 at 9.] According to Johnson, the progressive discipline program was not followed in Plaintiff's case due to the "severity of the policy infraction. She was in a supervisory position and basically ordered or told a subordinate to clock her in against company policy." [*Id.* at 7.]

Human Resources then allegedly met with Plaintiff and informed her that she could resign or be terminated for falsifying time records. [Doc. 22-5 at 3.] Plaintiff then allegedly informed Human Resources that she was filing formal sexual harassment charges against Dryja and Ducote. [*Id.* at 5.] On September 29, 2005, Defendant sent Plaintiff a letter that stated:

> During the meeting on September 28, 2005, you stated that you wanted to file charges of sexual harassment against the General Manager, Jeff Dryja, and the Division Manager, Morris Ducote. We take such allegations seriously, and want to conduct a thorough investigation. Please contact [Human Resources] at your earliest convenience so that we can arrange a time and place to meet with you to learn the specifics at your allegations. We can meet in our offices at the [Defendant's] plant, or at another mutually agreeable off site location. Obviously, we can not force you to meet with us. On the other hand, if you choose not to meet with us and share the details of your allegations, our ability to conduct a proper investigation will be severely restricted. I very much hope that you will call and arrange to meet with us.

[Doc. 22-6 at 9.] According to Johnson, Plaintiff did not agree to be interviewed. [*Id.* at 6.]

## II.     MOTION TO STRIKE

### a.     <u>Contradiction</u>

In its motion to strike, Defendant requests that the Court strike portions of Plaintiff's affidavit [Doc. 35-2] and Supplemental Memorandum of Law in Opposition to Defendant's Tennessee Watercraft Inc.'s Motion for Summary Judgment. [Doc. 45.] Defendant seeks to strike portions of Plaintiff's affidavit that contradict her sworn deposition. Plaintiff responds that there is no actual contradiction between her deposition testimony and her sworn affidavit because none of the testimony cited to indicates that she failed to apprise Defendant of Dryja's harassment. [*See* Doc. 50.] Defendant replies that Plaintiff was questioned about dates she alleged in her Complaint that she reported Dryja's alleged harassment. Furthermore, she failed to identify alternative dates on which her alleged complaints occurred despite given the opportunity to do so during her deposition. [*See* Doc. 52.]

The Sixth Circuit has recognized that a "party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citation omitted). However, *Reid* does not apply to situations where a sworn affidavit supplements an incomplete deposition. *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 907 (6th Cir. 2006). Thus, a post-deposition affidavit should be considered unless 'the issue raised by the contradictory affidavit constituted a sham.'" *Id.* at 908 (citations omitted). In determining the admissibility of a post-deposition affidavit at the summary judgment stage, a district court "must first determine whether the affidavit directly contradicts the nonmoving

party's prior sworn testimony." *Id.* "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.*

After reviewing the affidavit and deposition testimony relied on by Defendant, the Court finds that the affidavit does not directly contradict her deposition testimony. The deposition excerpts cited to in Defendant's motion to strike involve questions that ask about specific dates and specific meetings. For instance, Defendant's counsel asks, "Was there any discussion about sexual harassment by Jeff Dryja during September 1, 2005?" [Doc. 47-2 at 2.] Plaintiff responds, "I don't recall." [*Id.*] However, the deposition excerpts cited to in the motion to strike do not include testimony of Plaintiff denying that she reported sexual harassment to Human Resources during the relevant period or that she could not recall if she reported Dryja's alleged outside of the specific dates identified in the questions asked of her. In other words, the deposition testimony simply shows that Plaintiff could not recall if she reported Dryja's alleged harassment on the specific dates she was asked about. It fails to show that she did not report at other times in September of 2005. Other portions of her deposition could be construed as showing she did report the sexual harassment to Human Resources. For instance, Plaintiff testified that she "complained to Mike Johnson and to Collene Calfee" and specifically recalled talking to Calfee "but even the night before that [Plaintiff] got fired." [Doc. 46-2 at 23-24.] Though somewhat ambiguous, one could infer from the use of the phrase "but even" that Plaintiff had reported harassment even prior to the night prior to her termination.

Despite the ambiguity, such a statement counters Defendant's contention that Plaintiff's deposition is directly contradictory to the disputed affidavit. Also, it is undisputed that Plaintiff reported Dryja's alleged sexual harassment at the termination meeting. Thus, Plaintiff's affidavit is not directly contradicted since there is deposition testimony that she reported harassment at least two times to Human Resources in September of 2005. Due to the lack of direct contradiction, the Court will deny Defendant's motion to strike Plaintiff's affidavit.

b.    **Hearsay**

In the motion to strike, Defendant also seeks to strike portions of Plaintiff's Supplemental Memorandum that arguably rely upon hearsay. Defendant contends that the deposition testimony relied on by Plaintiff are hearsay because the testimony is based on the statements made by other parties, not the witnesses' personal knowledge. Plaintiff responds that deposition testimony based on the alleged statements of Defendant's managers is admissible as an admission by a party-opponent. As to deposition testimony based on Plaintiff's statements to the witnesses, Plaintiff contends that she has verified the statements made to the witnesses in an affidavit and that she will be available for cross-examination as to those statements. Plaintiff also contends that her statements qualify under the then existing mental, emotional or physical condition hearsay exception. Plaintiff further contends that the statements would fall within Federal Rule of Evidence 807's residual exception. Fed. R. Evid. 807.

The Sixth Circuit has recognized that "evidence submitted in opposition to a motion for summary judgment must be admissible," so "[h]earsay evidence . . . must be disregarded." U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997) (citation omitted). Under Rule 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

As to the alleged statements made by one of Defendant's managers, Shawn Cecil ("Cecil"), to witness Eric Bailey ("Bailey"), the Court finds that the statement is not hearsay. Admissions by party-opponents or statements made "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" do not constitute hearsay. Fed. R. Evid. 801(d)(2). Though Cecil's alleged statements were made outside of work, the subject matter concerned a matter within the scope of his employment. Defendant's sexual harassment policy provides that "[s]hould any supervisor or manager be advised or learn of a violation of this policy, he/she should immediately report the matter to the Human Resources Manager or the Plant Manager, who will arrange for a prompt and thorough investigation." [Doc. 22-3 at 29.] Thus, sexual harassment related-matters are within the scope of employment for Defendant's managers, like Cecil. Accordingly, his statements to Bailey constitute party-opponent admissions and are not hearsay. Thus, Defendant's motion to strike is denied to the extent it seeks to strike statements by Cecil.

As for the Plaintiff's statements referenced in the witnesses' depositions, Plaintiff relies, in part, on the present mental condition hearsay exception. Fed. R. Evid. 803(3). Rule 803(3) provides that a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). After reviewing the objected to testimony, the Court finds that the majority of the statements are statements of memory or belief to prove the fact remembered or believed. For instance, Mr. Bailey's deposition testimony that Dryja tried to get Plaintiff to go to a motel with him based on statements from Plaintiff is a memory of a past fact, expressly outside the scope of Rule 803(3). Similarly, the following are also outside the scope of Rule 803(3) because they constitute memories of past facts: (1) Mr. Dryja would also drive by Angela Cole's house and allow her to see him drive by her house on numerous occasions; (2) Mr. Dryja would pull Angela Cole into his office, touch Angela Cole; (3) Mr. Dryja exposed himself to Angela Cole; (4) Mr. Dryja tried to get Angela Cole to go to a motel with him in Georgia after the relationship was terminated but Angela Cole had refused to attend this overnight business trip in Georgia; (5) Angela Cole had filed a complaint against her supervisor, Jeff Dryja, prior to her termination and human resources did not do anything about it and she ended up being terminated; (6) Plaintiff made numerous complaints to the Human Resources Department about the sexual harassment by Dryja prior to the time-keeping incident. Rule 803(3) is inapplicable to those statements because they are offered to prove past conduct. However, Rule 803(3) is applicable to

12

statement of a declarant's then existing emotion or mental feeling. In the present case, there are statements about Plaintiff feeling extremely stressed and being constantly worried about losing her job. The Court finds that these statements are about her then existing mental and emotional feelings, so Rule 803(3)'s hearsay exception is applicable to those statements.

Plaintiff also contends that the statements are not barred as hearsay because she swore in an affidavit declaring and affirming the statements were attributed to her. However, Plaintiff has provided no authority in support of this contention. The statements meet the definition of hearsay, namely, out-of-court statements offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Though applicable to prior statements by a witness at trial, Rule 801(d)(1) provides guidance as to viability of Plaintiff's argument. Prior statements by a witness are not hearsay when the declarant is available for cross-examination and are for certain limited purposes. Notably, the mere fact the declarant is available for cross-examination does not render the prior statement as not hearsay. Similarly, Plaintiff's mere affirmation of statements does not render her prior statements as not hearsay; the statements are still out-of-court statements offered to prove the truth of the matter asserted in need of an applicable hearsay exception or exemption. Accordingly, the Court is unpersuaded by Plaintiff's "verification" argument absent applicable supporting authority.

Finally, Plaintiff contends that Rule 807's residual exception is applicable. Rule 807 provides:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a

material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807. The Court finds that there is other evidence which can be procured by Plaintiff, namely her own testimony by deposition. Furthermore, the Court does not find the "equivalent guarantees of trustworthiness" present in this case to warrant application of the Rule 807.

Accordingly, the Court will grant in part and deny in part Defendant's motion to strike portions of Plaintiff's supporting memorandum. The Court will not strike the portions based on statements by Cecil under Rule 801(d)(2). The statements regarding Plaintiff's feeling of stress and worry will also not be struck in light of Rule 803(3). However, portions of the supporting memorandum based on hearsay statements will be struck, and the Court will not consider such statements in determining whether to grant Defendant's motion for summary judgment.

## III.   MOTION FOR SUMMARY JUDGMENT

## A.  <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts

and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* at 249. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. *Id.* Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## B.     Title VII and THRA

As an initial matter, the Supreme Court of Tennessee has held that an analysis of claims under the Tennessee Human Rights Act ("THRA") is the same as under Title VII of the Civil Rights Act of 1964 ("Title VII"). *Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006). Thus, the Court equally addresses Plaintiff's THRA claims in its discussion of her Title VII claims.

### 1.      Hostile Work Environment

Under Title VII and the THRA, Plaintiff claims a hostile work environment due to her sex. Title VII provides that it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The THRA has similar provisions regarding employment discrimination. Tenn. Code Ann. § 4-21-401.

In order to establish the prima facie case for a hostile work environment claim under Title VII, a plaintiff must show: (1) the employee is a member of a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the existence of employer liability. *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006). In cases of supervisor sexual harassment, "an employer *is* vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Clark v. United Parcel Serv.*, 400 F.3d 341, 348 (6th Cir. 2005) (emphasis in original) (citation omitted). Thus, employer liability "depends on the consequences of the supervisor's actions." *Keeton v. Flying J, Inc.*, 429 F.3d 259, 262 (6th Cir. 2006).

In cases of alleged supervisor harassment, employers may avail themselves of the *Faragher/Ellerth* affirmative defense "so long as the harassment did not result in a negative

tangible employment action for the victim." *Clark*, 400 F.3d at 348. "If proven sexual harassment by the supervisor did not result in a tangible employment action, then the employer may not be liable if it engaged in preventative or corrective measures and the plaintiff unreasonably failed to utilize the measures the employer provided," or the *Faragher/Ellerth* affirmative defense. *Keeton*, 429 F.3d at 262 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). A tangible employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Keeton*, 429 F.3d at 263 (citation omitted). The Court notes that defendants attempting to establish an affirmative defense on summary judgment must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 502 n.2 (6th Cir. 2007) (alteration in original) (citing Fed. R. Civ. P. 56(c)).

Defendant contends that the fifth element of the prima facie case regarding employer liability is not satisfied because all the requirements of the *Faragher/Ellerth* affirmative defense have been satisfied. Plaintiff responds that summary judgment is not appropriate because there are genuine issues of material fact regarding the *Faragher/Ellerth* affirmative defense.

The affirmative defense is only available under circumstances where the alleged harassment did not result in a negative tangible employment action for Plaintiff. *See Clark*,

400 F.3d at 348. Defendant contends that it has met this threshold requirement because Dryja was in Washington, D.C., when the decision to terminate Plaintiff was made by Human Resources. Plaintiff responds that the "undesirable reassignment" under Ducote and the decision to terminate her, in which Dryja was consulted, constitute negative tangible employment actions.

As to the reassignment under Ducote, the reassignment does not meet the standard of a negative tangible employment action. The Supreme Court has held that reassignments resulting in "significantly different responsibilities," a "significant change in benefits," or "direct economic harm" constitute tangible employment actions. *Ellerth*, 524 U.S. at 761-62. In the present case, Plaintiff has presented insufficient evidence that her reassignment involved any significant changes in her employment status, as contemplated in *Ellerth*. Though the evidence shows Plaintiff's subjective dissatisfaction with Ducote, the Court is unpersuaded that this is sufficient to constitute a tangible employment action. Plaintiff's argument is further weakened by evidence that Plaintiff was not reporting to Ducote nor was she officially under his chain-of-command. Thus, there is insufficient evidence that the reassignment in this case constituted a tangible employment action.

As to Plaintiff's contention that her termination constituted a tangible employment action resulting from Dryja's alleged harassment, the Court finds that there remains a genuine issue of material fact. Under *Ellerth*, termination from employment constitutes a tangible employment action as it is a significant change in employment status. *Ellerth*, 524 U.S. at 761. However, there is a remaining question of whether Dryja's alleged harassment

"resulted in a negative tangible employment action." *Clark*, 400 F.3d at 348. There is evidence that, despite being in Washington, D.C., Dryja was consulted during the decision-making process that resulted in Plaintiff's termination and that the progressive discipline program was not followed in Plaintiff's case. [Doc. 22-7 at 7-8.] Because all facts and inferences are construed in Plaintiff's favor at this stage, there is a genuine issue of material fact as to whether Dryja's harassment resulted in a tangible employment action.

Even if tangible employment action requirement was undisputed, there are remaining genuine issues of material fact as to the affirmative defense requirements: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Clark*, 400 F.3d at 348 (citations omitted). As to the first prong, the Sixth Circuit has recognized that employers "have an *affirmative duty* to prevent sexual harassment by supervisors." *Id.* at 349 (emphasis in original) (citation omitted). A "reasonable" sexual harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy. *Id.* at 349-50. On its face, Defendant's written sexual harassment policy satisfies the first three minimal requirements as it provides:

> Any employee who believes he/she has been the victim of sexual harassment should immediately notify his/her supervisor. If an employee prefers to discuss the circumstances with someone other than his/her supervisor, he/she

is invited to contact the Human Resources Manager, the plant Manager, or any other member of management with whom the employee would feel comfortable.

[Doc. 22-3 at 29.] Furthermore, there is evidence that Defendant provided sexual harassment training regarding its policy. [*Id.* at 31-32.]

The analysis of the first prong then proceeds to "an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Clark*, 400 F.3d at 349. In the present case, Plaintiff testified that she told her direct supervisor, Ball, in July of 2005 that she did not want to be with Dryja by herself and that Dryja made her feel "very uncomfortable." [Doc. 46-2 at 29.] Under Defendant's sexual harassment policy, "[s]hould any supervisor or manager be advised or learn of a violation of this policy, he/she should immediately report the matter to the Human Resources Manager or the Plant Manager, who will arrange for a prompt and thorough investigation." [Doc. 22-3 at 29.] Though the record does not indicate whether Ball reported Plaintiff's concerns, Human Resources Manager Johnson stated in his affidavit that he was first informed of Dryja's alleged harassment at the meeting regarding the time keeping incident on September 28, 2005. [Doc. 22-6 at 4.] It is also unclear whether Ball reported Plaintiff's concerns to Dryja, the plant manager, but there is evidence that Dryja spoke with Plaintiff regarding the overnight stay. [Doc. 46-7 at 21.] Such evidence raises questions whether Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior since Ball either did not report Plaintiff's concerns as was required by the Defendant's sexual harassment policy or he did report Plaintiff's concerns

to Dryja, the subject of the concerns. The latter scenario would evince unreasonable care in preventing sexually harassing behavior since the subject of the concern would be involved in the investigation of himself. Such evidence also raises a genuine issue of material fact as to the second prong of the affirmative defense. There is other evidence that Plaintiff reported Dryja's alleged sexual harassment to Calfee the night before her termination, to which Calfee allegedly failed to respond, which also raises questions related to both prongs of the affirmative defense. Though the credibility of evidence in Plaintiff's favor may be questioned, such a determination is within the province of the jury and not for the Court at summary judgment.

Because there remains a genuine issue of material fact as to *Faragher/Ellerth* affirmative defense asserted by Defendant, the Court will deny summary judgment as to the hostile work environment claim.

### 2. Retaliation

A Title VII plaintiff may establish retaliation by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Direct evidence "requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Id.* at 544. In the present case, Plaintiff has not presented direct evidence of retaliation, such as an explicit statement from Defendant that she was being retaliated against in response to her complaints. *See id.* Rather, she has advanced a retaliation claim based on circumstantial evidence. To establish the prima facie case of

retaliation for a Title VII claim based on circumstantial evidence, a plaintiff must establish that "(1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008). The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Imwalle*, 515 F.3d at 544 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Then, plaintiff "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. In the present case, Defendant argues that Plaintiff cannot establish a causal connection between her alleged protected activity and her termination from employment. According to Defendant, Plaintiff's failure to report Dryja's alleged sexual harassment prior to the time keeping incident shows that her termination was not due to her complaints to Human Resources.

As to the causal connection element, the Court is guided by the Sixth Circuit precedent. In *Mickey v. Zeidler Tool and Die Co.*, the Sixth Circuit found that "[w]here an adverse employment action occurs very close in time after an employer learns of protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying the prima facie case of retaliation." 516 F.3d 516, 525 (6th Cir. 2008). In the present case, Plaintiff has testified

that she was terminated the day after allegedly reporting Dryja's sexual harassment in a conversation with Calfee of Human Resources. Thus, there is sufficient evidence to satisfy the causal connection element. Though Calfee has testified that Plaintiff did not report Dryja's alleged sexual harassment during their conversation, this conflicting evidence creates a genuine issue of material fact. Furthermore, there is evidence that Plaintiff allegedly complained about sexual harassment regarding Ducote during September of 2005, the same month as her termination.

The burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant has articulated such a reason, namely that Plaintiff was terminated for having Evans clock her in early in violation of Defendant's policy against the falsification of time records.

Because Defendant has articulated a legitimate, nondiscriminatory reason, the burden returns to "plaintiff to show that the reason put forth by the defendant is pretextual, which can be done 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 704 (6th Cir. 2007).

Construing all facts and inferences in a light most favorable to Plaintiff, the Court finds that there is a genuine issue of material fact regarding pretext. Plaintiff has presented evidence that Defendant did not follow its progressive discipline program and that it did not investigate according to normal procedure since "both sides" were not alleged talked to during the investigation prior to the termination decision. [Docs. 22-7 at 7; 45-2 at 13.]

Though mere disagreement with an employer's investigative procedure is insufficient to create a genuine issue of material fact, Plaintiff has presented additional evidence of pretext. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (citations omitted). For instance, there is evidence that a member of Defendant's management, Cecil, threatened another employee, Bailey, from testifying at Plaintiff's unemployment benefits hearing. Additionally, there is evidence that Plaintiff had a heated conversation with Dryja on the warehouse floor regarding her sexual harassment concerns about Ducote the same month as her termination by Defendant and that Dryja was consulted to some degree regarding Plaintiff's termination. When construed in a light most favorable to Plaintiff, such evidence raises questions about the motivation behind the termination of Plaintiff and whether the time-keeping incident was sufficient reason to terminate Plaintiff. Accordingly, the Court will deny Defendant's motion for summary judgment as to the Title VII/THRA retaliation claim.

**C.** **Common Law Retaliatory Discharge**

To prevail on a common law claim for retaliatory discharge, an employee must prove: (1) that an at-will employment relationship existed between the employee and the employer, (2) that the employee was discharged, (3) that the employee was discharged for attempting to exercise a statutory or constitutional right, or for any other reason that violates a clear public policy, and (4) that such action was a substantial factor in the employer's decision to discharge the employee. *Collins v. AmSouth Bank*, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007) (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 535 (Tenn. 2002)).

In support of its motion for summary judgment, Defendant relies on the same arguments as argued in regard to Plaintiff's Title VII/THRA retaliation claims. In *Allen v. McPhee*, the Supreme Court of Tennessee adopted the rule that "close temporal proximity of a complaint and a materially adverse action are sufficient to establish a prima facie case of causation." *Allen v. McPhee*, 240 S.W.3d 803, 823 (Tenn. 2007) (discussing causation in the context of a THRA claim). Likewise, close temporal proximity is sufficient circumstantial evidence of a causal link for common law retaliation claims. Furthermore, Tennessee courts have recognized that circumstantial evidence includes "the employer's failure to adhere to established company policy" and other "evidence tending to show that the stated reason for discharge was false." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006). Thus, evidence of Defendant's failure to adhere to its sexual harassment policy when Supervisor Ball allegedly failed to properly report Plaintiff's concerns and evidence of an incomplete investigation of the time-keeping incident are additional circumstantial evidence establishing causation. Thus, there is sufficient evidence of causation for summary judgment purposes.

Notably, Tennessee courts have "followed the burden shifting scheme as developed under federal employment law" for common law retaliatory discharge claims. *Provonsha v. Students Taking a Right Stand, Inc.*, No. E2007-00469-COA-R3-CV, 2007 WL 4232918, at *4 (Tenn. Ct. App. Dec. 3, 2007). Accordingly, the burden-shifting analysis discussed in relation to Plaintiff's Title VII and THRA claim is incorporated into the present analysis of the common law retaliatory discharge claim. Defendant has articulated a legitimate,

nondiscriminatory reason for Plaintiff's termination, and Plaintiff has presented sufficient evidence of pretext for her claim to survive summary judgment. Thus, Defendant's motion for summary judgment will be denied as to Plaintiff's common law retaliatory discharge claim.

## D.  Limitation of Damages: After-Acquired Evidence

Defendant also argues that under the after-acquired evidence doctrine, Plaintiff should be barred from recovering front pay, if any, and any award of back pay should be limited. Under the after-acquired evidence doctrine, "[w]here any employer can show it would have been entitled to terminate the employee for severe wrongdoing, if it had known of the employee's wrongdoing at the time, the employee's remedies for discrimination are limited." *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1168 (6th Cir. 1996). Thus, "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995).

Under this doctrine, Defendant contends that Plaintiff intentionally misrepresented her relationship with Dryja during an investigation regarding Mary Denomie's charge of discrimination regarding Defendant's promotion of Plaintiff. Plaintiff responds that severity of her wrongdoing is insufficient for the purposes of the after-acquired evidence doctrine because Human Resources' representatives failed to investigate even though they were aware of rumors regarding Plaintiff's consensual sexual relationship with Dryja. The Court finds

26

that there is a genuine issue of material fact regarding the severity of Plaintiff's alleged wrongdoing. Thus, summary judgment on Defendant's defense regarding the after-acquired evidence doctrine will be denied.

## IV. CONCLUSION

For the reasons set forth herein, Defendant Tennessee Watercraft, Inc.'s motion for summary judgment [Doc. 22] is hereby **DENIED**. Defendant's "Motion to Strike the April 30, 2008 Affidavit of Angela D. Cole and Portions of Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant Tennessee Watercraft, Inc.'s Motion for Summary Judgment" [Doc. 47] is **GRANTED in part** and **DENIED in part**. Defendant's "Motion for Leave to Present Oral Argument in Support of Motion for Summary Judgment" [Doc. 48] is also hereby **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE